IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PRAXIS ENERGY AGENTS PTE LTD, | : |
| Plaintiff, | : |
| v. | : C.A. No. 17-559-LPS |
| M/V PEBBLE BEACH,<br>its engines, tackle, apparel and freights, | : |
| Defendant *in rem*. | : |

Timothy Jay Houseal, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, DE

J. Stephen Simms and Marios J. Monopolis, SIMMS SHOWERS LLP, Baltimore, MD

    Attorneys for Plaintiff.


Michael B. McCauley, PALMER BIEZUP & HENDERSON LLP, Wilmington, DE

Frank P. DeGuilio and Kevin G. O'Donovan, PALMER BIEZUP & HENDERSON LLP, Philadelphia, PA

    Attorneys for Defendant *in rem*.

**MEMORANDUM OPINION**

September 25, 2018
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court is Plaintiff Praxis Energy Agents Pte Ltd's ("Praxis" or "Plaintiff") Motion for Summary Judgment and for Fed. R. Civ. P. 54(b) Final Judgment Entry (D.I. 22), Sithonia Shipholding S.A.'s ("Sithonia" or "Defendant") Motion for Discovery Prior to Filing Opposition to Praxis' Motion for Summary Judgment (D.I. 37), and Sithonia's Cross Motion for Summary Judgment (D.I. 39-4). Sithonia has appeared as owner of Defendant *in rem*, the M/V PEBBLE BEACH (hereinafter, the "Vessel"). The parties have not requested oral argument.

## I. BACKGROUND

Unless otherwise stated, the following facts are not disputed. On August 29, 2014, Sithonia, as owner of the Vessel, entered a Charter Party agreement with Greatwin Carrier (Holdings) Co., Ltd. ("Greatwin"). (D.I. 37-4) Relevant to this suit, Greatwin agreed that it "will not procedure [*sic*] suppliers, necessaries or services including, inter alia, bunkers on the credit of the owners or the vessel or in the owner's name or the vessel's name and if required will provide evidence thereof to the owners." (*Id.* at 9)

On September 2, 2014, while in Russia, Greatwin placed an order with Praxis for bunkers (i.e., marine fuel) for the Vessel. (D.I. 22-2) (Affidavit of Pritam Singh ("Singh Aff.") at 1) That same day, Praxis emailed Greatwin a Bunker Nomination (i.e., purchase order) which provides, in relevant part, "the acceptance of marine fuels . . . by the nominated vessel shall be deemed to constitute the clear acceptance of our standard terms and conditions, which include expressly seller's maritime lien rights." (*Id.* at 2, Ex. 1) (all caps removed) A representative from Greatwin confirmed the Bunker Nomination that same day. (*Id.* at 2, Ex. 2) Praxis' General

1

Terms and Conditions for the Sale of Marine Bunker Fuels and Lubricants ("Terms and Conditions") (which the parties presume are the "standard terms and conditions" referenced in the Bunker Nomination) provide under Section 10.00 "Maritime Lien":

> Where Products are supplied to a Vessel, in addition to any other security, the agreement is entered into . . . . It is agreed and acknowledged that the sale of Products to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Products, such maritime lien afforded to the Company over the Vessel. . . . In case the Buyer is not the owner of the Vessel, it hereby expressly warrants that it has the authority of the owner to pledge the Vessel's credit and create a lien upon her as aforesaid and that he has given notice of the provisions of this Clause to the owner. The Company shall not be bound by any attempt by any person to restrict, limit or prohibit its lien or liens attaching to a Vessel, either by clausing the Physical Supplier's delivery receipts or otherwise.

(*Id.* Ex. 3 § 10.00) The Terms and Conditions further provide that General Maritime Law of the United States of America governs the agreement. (*Id.* Ex. 3 § 22.01) Praxis subcontracted Alliance-Bunker, a local physical supplier, to deliver the bunkers to the Vessel. (*Id.* at 2)

On September 8, 2014, Nikolaos Pantelias, Operations Manager at Evalend Shipping Company S/A ("Evalend"), which is the Ship Manager for the Vessel, emailed Alliance-Bunker after learning that Greatwin arranged for Alliance-Bunker to deliver fuel to the Vessel. (D.I. 39-1) (Affidavit of Nikolaos Pantelias ("Pantelias Aff.") at 1) With subject line "MV Pebble Beach Due to Bunker For Charterers Account," the email provided the text of the above-cited provision in the Charter Party agreement limiting Greatwin's authority to procure bunkers on the credit of the Vessel and further stated, "under no circumstances your contractual partner can receive bunkers on credit against a maritime lien on the vessel." (*Id.* Ex. A) The email continued:

> You are hereby put on notice that any bunkers to be delivered on board the vessel is for the account of the charterers and charterers

> alone and charterers have no right to allow any such rights to be vested to you in connection with said bunkers.
>
> The Master reading this message in copy will ensure that an appropriate stamp will be inserted in the BDN [Bunker Delivery Note] on completion of the bunkering and obtain the signature of your representative prior to bunkering that you are aware of the above quoted stipulation.

(*Id.* Ex. A) The email attached a form letter ("Skipper Letter") (*id.* Ex. B), which "was to be delivered by the Master of the [Vessel] to the Master of the bunker barge [to sign] before the bunkers were delivered." (*Id.* at 2) The Skipper Letter is written as a statement from the skipper of the barge Carnival "[f]or and on Behalf of the Physical Supplier [Alliance-Bunker]." (*Id.* Ex. B) The Skipper Letter provides that the barge Carnival, on behalf of Alliance-Bunker, acknowledges "that vessel's charterers are the party responsible for the payment of the value of the bunkers the vessel will receive and Owners, the Master and the crew will not be called upon to pay any sums in connection therewith." (*Id.* Ex. B) The Skipper Letter further provided that "[a]ny maritime lien rights that the physical Suppliers [Alliance-Bunker] may have under the terms of this sale or otherwise are hereby fully and unreservingly waived." (*Id.* Ex. B)

Captain Domingo Bautista Dacillo, Master of the Vessel, received the September 8 email and form Skipper Letter. (D.I. 44-1) (Affidavit of Captain Domingo Bautista Dacillo ("Dacillo Decl.") at 1)

Captain Dacillo affirms that on September 11, 2014 he signed the Skipper Letter, which was delivered to the Captain of the barge Carnival, who also signed the Skipper Letter before any bunkers were delivered. (*Id.* at 2) Mr. Singh claims that the signed Skipper Letter is not genuine and that the signature is fake. (Singh Aff. at 3) From 9:30 PM on September 11 to 1:30 AM on September 12, Alliance-Bunker delivered the bunkers. (*Id.* Ex. 4)

It is undisputed that a Bunker Delivery Note (i.e., receipt) was provided to the Vessel for the delivery, which was signed by the Captain of the Vessel. (*Id.* Ex. 4) The Bunker Delivery Note attached to the Singh Affidavit contains a "no lien" stamp that states:

> The goods and / or services being hereby acknowledged receipt for and / or ordered are being accepted and / or ordered solely for the account of Messrs Greatwin Carrier (Holdings) Co. Ltd. of the m.s. Pebble Beach and not for the account of said ship or her owners. Accordingly, no lien or other claim against said ship can arise therefrom.

(*Id.* Ex. 4) However, Mr. Singh affirms that this "no lien" stamp "was added only after the bunkers were pumped into [the Vessel] and the supply was completed." (*Id.* at 3)[1]

Ultimately, Greatwin failed to pay Praxis by the due date of October 10, 2014 and has still not paid for the bunkers. (*Id.* Ex. 7) Nevertheless, Praxis paid for Alliance-Bunker's services on October 14, 2014. (*Id.* at 3)

About one year later, on August 21, 2015, when the Vessel arrived at the port of Rio Grande, Brazil, Praxis filed a pleading in Brazil against Evalend, Sithonia, and Greatwin asking the Court to detain the Vessel pending deliberation from the Court and to grant a Writ of Preliminary Attachment as to the Vessel until defendants provide a security for the amount of $270,000 (the "Brazilian Action"). (D.I. 39-2 at 3-4, 18) A Brazilian attorney, Dr. Arthur Rocha

---

[1] In support of Praxis' assertions that the signed Skipper Letter is not genuine and that the Bunker Delivery Note did not contain a "no lien" stamp until after delivery, Praxis submitted a letter from Dmitry Korotkiy, the owner of the barge Carnival, dated May 12, 2017. (Singh Aff. Ex. 6) The letter provides: "neither our skipper/Master of the barge Mr. Cherniy D.V., nor our company, have ever signed the attached alleged acknowledgment . . . nor have we/has he ever been notified by any party whatsoever in respect of the alleged points of the said document before or after the supply. We only noted after the supply, a stamp at the right upper corner of the also attached Bunker Delivery Note, which however was placed after the supply was completed." (*Id.*)

4

Baptista, who represented the Vessel, Evalend, and Sithonia in the Brazilian Action, referred to it as "a lawsuit of arrest proceedings" in which the "Brazilian court ordered that the [Vessel] should be arrested and that the [V]essel not depart from the port of Rio Grande, Brazil." (D.I. 16-1) (Affidavit of Dr. Arthur Rocha Baptista ("Baptista Aff.") at 1-2) The defendants in the Brazilian Action provided security to obtain the release of the Vessel. (*Id.* at 3) On October 11, 2016, Praxis' Brazilian Action was dismissed, a decision which was affirmed on March 30, 2017. (*Id.*) The security provided remains in the custody of the Brazilian court. (*Id.*)

Nearly two years later, on May 12, 2017, when the Vessel arrived at the port of Wilmington, Delaware, Praxis filed a complaint in this Court seeking issuance of a warrant for arrest of the Vessel *in rem*. (D.I. 1, 5) The warrant was issued the same day. (D.I. 9) Two days later, the Vessel was released on provision of security through a Letter of Understanding ("LOU"), which was replaced by a surety bond on August 22. (D.I. 10, 21) On June 16, 2017, Sithonia appeared as owner of the Vessel, answered the Complaint, filed a Counterclaim, and sought countersecurity for the counterclaim from Praxis. (D.I. 16) Praxis answered the counterclaim on July 5 (D.I. 19) and filed its pending motion for summary judgment on November 27. On December 22, the Court ordered Praxis to provide the countersecurity and stayed the proceedings until it was paid. (D.I. 26) Praxis paid the countersecurity on April 20, 2018 and, as a result, the Court lifted the stay on June 4. (D.I. 32) On June 14, the Court issued a Scheduling Order, which set a briefing schedule for Praxis' summary judgment motion and set fact discovery to close on September 30. (D.I. 36) The following day, Sithonia filed its pending Rule 56(d) motion for discovery and, thereafter, on June 27, filed its cross-motion for summary judgment.

## II. LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks

6

omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

"It is well established that a court is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery." *Shelton v. Bledsoe*, 775 F.3d 554, 565 (3d Cir. 2015) (internal quotation marks and alterations omitted). "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). "[A] party seeking further discovery in response to a summary judgment motion [must] submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Dowling v. Philadelphia*, 855 F.2d 136, 139-40 (3d Cir. 1988).

7

## III. DISCUSSION

### A. Cross-Motions for Summary Judgment

Praxis argues that summary judgment should be granted in its favor based on the following reasoning. The Bunker Nomination incorporated Praxis' Terms and Conditions, which states that any disputes relevant to the agreement are governed by the General Maritime Law of the United States of America, so U.S. admiralty common law and the Commercial Instruments and Maritime Lien Act ("CIMLA," previously called the Federal Maritime Lien Act or "FMLA") applies. The CIMLA (46 U.S.C. § 31301 *et seq.*) grants a maritime lien on the vessel and a right to bring a civil action *in rem* to enforce the lien to "[a] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner." 46 U.S.C. § 31342(a). It is undisputed that marine fuel bunkers are "necessaries." (D.I. 22-1 at 5) Those "presumed to have authority to procure necessaries for a vessel" include the owner, the master, an officer or agent appointed by the owner or a charterer, and a person entrusted with the management of the vessel at the port of supply. *See* 46 U.S.C. § 31341(a). Praxis asserts that Greatwin, as charterer of the Vessel, was presumed to have authority to bind the Vessel when it entered the contract with Praxis. (D.I. 22-1 at 6) Indeed, "[i]t is a fundamental tenet of maritime law that charterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries." *World Fuel Servs. Sing. Pte, Ltd. v. Bulk Juliana M/V*, 822 F.3d 766, 772-73 (5th Cir. 2016). Additionally, "although [Praxis] did not physically supply the bunkers, a party need not be the physical supplier or deliverer to have 'provided' necessaries under the statute." *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1245 (11th Cir. 1999). Accordingly, Praxis asserts that having met

the requirements under the CIMLA, it holds a maritime lien against the Vessel in the amount of $177,870 and should also be awarded prejudgment interest. (D.I. 22-1 at 6)

Sithonia counters that Praxis' motion should be denied and, instead, summary judgment should be entered in favor of Sithonia. It makes three independent arguments for its position. First, Sithonia argues that since it was not a party to the contract between Praxis and Greatwin it is not bound by the U.S. choice-of-law clause in the Terms and Conditions, so there is no basis to apply U.S. law to invoke a maritime lien. Second, Sithonia argues that since it already provided security for the release of the Vessel from arrest in Brazil, Praxis no longer has a right to assert a second maritime lien against the Vessel related to the same conduct, so the arrest in Delaware was invalid. Third, Sithonia argues that Praxis had notice that Greatwin was barred from incurring maritime liens against the Vessel and, therefore, Praxis cannot invoke a maritime lien against the Vessel.

### 1. Application of U.S. Choice-of-Law Clause

Sithonia argues that "because Sithonia was not a party to the Agreement between Praxis and Greatwin, the Vessel is not bound by the U.S. choice of law and maritime lien clauses included in Praxis' Terms and Conditions." (D.I. 39 at 3-4) Yet Sithonia concedes that "maritime liens arise only by operation of law and not by contract." (*Id.* at 16; *see also In re World Imports Ltd.*, 820 F.3d 576, 586 (3d Cir. 2016) ("[A] maritime lien arises from the usages of commerce, independently of the agreement of the parties.") (internal quotation marks omitted); *Bominflot, Inc. v. M/V Henrich S*, 465 F.3d 144, 146 (4th Cir. 2006) ("[M]aritime liens are *stricti juris* and cannot be created by agreement between the parties; instead, they arise by operation of law.")) Thus, any entitlement Praxis has to a maritime lien did not arise from its

9

contract with Greatwin. The Court needs to determine whether the U.S. choice-of-law provision agreed to between Praxis and Greatwin applies in the present case.

"United States maritime law governs whether the choice-of-law provision is enforceable." *Triton Marine Fuels Ltd. S.A. v. M/V Pacific Chukotka*, 575 F.3d 409, 413 (4th Cir. 2006). Courts of Appeals are split on whether to enforce a choice-of-law clause in a bunker agreement to which the vessel owner was not a party against the vessel owner. The Third Circuit has not addressed this issue. *Triton Marine*, a decision by the Fourth Circuit, is on point and analyzes the relevant decisions from other circuits.

In *Triton Marine*, 575 F.3d at 411-12, the vessel owner prohibited its charterer from incurring maritime liens against the vessel, yet fuel bunkers were ordered but not paid for pursuant to a bunker confirmation with a U.S. choice-of-law provision. The *Triton* Court noted that the Fifth and Ninth Circuits applied U.S. choice-of-law provisions in a supply contract to an action *in rem* against a vessel despite the transaction taking place abroad amongst foreign parties. *See Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120 (9th Cir. 2008); *Liverpool & London S.S. Prot. & Indem. Ass'n v. Queen of Leman MC*, 296 F.3d 350 (5th Cir. 2002). "[W]here foreign parties have specified that they want United States law to determine the existence of a maritime lien in a transaction involving multiple foreign points of contact, and the ship has sailed into the United States, it is reasonable to uphold the choice of American law." *Trans-Tech*, 518 F.3d at 1126-27 (discussing *Queen of Leman*). Similarly, in *Triton Marine*, 575 F.3d at 415, since "the parties agreed to have their transaction governed by the laws of the United States, and the Vessel sailed into a United States port," applying U.S. law "would not result in any fundamental unfairness to [the vessel owner]."

The Second Circuit, on the other hand, considered maritime choice-of-law factors and applied British law instead of a contractual choice-of-law provision requiring U.S. law, because "maritime liens arise separately and independently from the agreement of the parties, and rights of third persons cannot be affected by the intent of the parties to the contract." *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1026 (2d Cir. 1973).

The action here is brought *in rem* against the Vessel rather than *in personam* against Sithonia, so whether Sithonia was a party to the supply agreement is not decisive. The Court finds the Fourth Circuit's analysis in *Triton Marine* is reasonable and concludes that U.S. law applies to the present dispute. The Court will next consider whether Praxis was entitled to enforce a maritime lien against the Vessel when it arrived in Delaware.

### 2. Impact of Brazilian Action on U.S. Maritime Lien

Sithonia argues that a Vessel cannot be arrested twice for the same claim, so the prior arrest of the Vessel in Brazil causes its arrest in Delaware to be invalid. (D.I. 39 at 8-11) The Brazilian Action and the present suit indisputably arose from the same claim based on Clause 10.00 of Praxis' Terms and Conditions concerning maritime liens. (*Id.* at 8; D.I. 39-2 at 4) It is further undisputed that the Brazilian Action was (at least initially) brought against Evalend, Sithonia, and Greatwin, and not the Vessel *in rem*. (D.I. 39-2 at 3-4)

It is well-established in the Third Circuit that the predicate for a valid arrest of a ship through an *in rem* action is the existence of a valid maritime lien. *See Petroleos Mexicanos Refinacion v. M/T King A*, 554 F.3d 99, 102-03 (3d Cir. 2009) ("A maritime lien and a proceeding *in rem* are correlative; where one exists, the other can be taken, and not otherwise. [internal quotation marks and citation omitted] Accordingly, any action *in rem* pursuant to

11

Supplemental Rule C to enforce a maritime lien on a vessel must be premised on the existence of a valid maritime lien at the time that the action was filed.") (citing cases). If a security or Letter of Understanding issues to release the vessel from arrest, "the maritime lien transfers from the vessel to the LOU." *Id.* at 104 (noting LOU "becomes a complete substitute for the *res*").

> As stated in *The Law of Admiralty*: "With respect to a lien in suit the effect of release is to transfer the lien from the ship to the fund represented by the bond or stipulation. The lien against the ship is discharged for all purposes and the ship cannot again be libeled *in rem* for the same claim."

*Id.* (citing Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 9–89, at 799 (2d ed. 1975) (footnote omitted)); *see also World Imports*, 820 F.3d at 585 ("[I]t is familiar doctrine of the admiralty courts that a maritime lien attaches not only to the original subject of the lien, but also to whatever is substituted for it.") (internal quotation marks omitted).

Praxis argues that the Brazilian Action was *quasi in rem*, not *in rem*, since the Vessel was not a named defendant. (D.I. 43 at 8) Rather than arguing its position, Praxis provided the Court with extensive block quotations (sometimes extending nearly two pages) from cases supposedly supporting its position. While such briefing techniques are discouraged, particularly because it leaves the Court guessing as to what the arguments are, the Court has considered all of the cases cited by Praxis in reaching its conclusions. Praxis notes that there are three types of actions – *in personam* and *in rem* actions, which may arise from the same claim but be brought separately against a person and property, respectively, and *quasi in rem* actions, which permit attachment of property to satisfy the claim when the Court has no jurisdiction over the person. (*Id.* at 10) (citing *Belcher Co. of Ala. v. M/V Maratha Mariner*, 724 F.2d 1161, 1163-66 (5th Cir. 1984))

Praxis cites cases that consider whether an attachment precludes a later arrest to enforce a maritime lien. The *Belcher* Court explained that since "Dutch law does not recognize the concept of maritime lien" – meaning "an *in rem* action could not be brought in the Netherlands" – "the attachment there filed" "does not convert . . . into an *in rem* proceeding." 724 F.2d at 1164. The *Belcher* Court discusses the similarities between arrest and attachment, but notes that release from an attachment does not clear the lien (as release from arrest would). *Id.* at 1165; *see also Monjasa A/S v. M/V Peristil*, 2013 A.M.C. 2832, 2849 (D. Or. 2013) (noting seizure in India, which does not recognize maritime liens, "was not an arrest to enforce a maritime lien" and, "therefore, did not discharge any maritime lien Plaintiff may have arising under United States law").

Unlike the Netherlands and India, it is undisputed that Brazil does recognize maritime liens. (D.I. 43 at 12 (citing *Bominflot*, 465 F.3d at 148); D.I. 44 at 2) As such, Sithonia argues that *Belcher* and *Monjasa* are irrelevant here, because they do not address whether Praxis can arrest the Vessel twice for the same maritime lien. (D.I. 44 at 2) Moreover, Sithonia argues that since "[a] martime lien only affords the plaintiff with a claim against the vessel *in rem*, but does not provide a plaintiff with a claim against the vessel owner," and since Praxis' pleading in the Brazilian Action was replete with references to its maritime lien, the Brazilian Action must have been an action *in rem* for an arrest rather than an action *quasi in rem* for an attachment. (*Id.* at 3; *see also Cal Dive Offshore Contractors, Inc. v. M/V Sampson*, 245 F. Supp. 3d 473, (S.D.N.Y. 2017) ("When a maritime lien attaches, the plaintiff may pursue an *in rem* action against the vessel involved. Besides an *in rem* action against the vessel, the plaintiff also has the option of bringing an *in personam* action against any party that is directly liable. . . . However, if there is

no separate basis of substantive liability, the *in personam* liability does not attach merely because a maritime lien has come into existence.") (internal citations, quotation marks, and alterations omitted))

In order for the Court to grant summary judgment to either Praxis or Sithonia, there must be an answer to the following question without any genuine issues of material fact that may impact the answer: In the Brazilian Action, did Praxis have a separate basis of substantive liability against Sithonia *in personam* or was the Vessel *in rem* arrested in accordance with Praxis' maritime lien? Sithonia points to several paragraphs in the pleading in the Brazilian Action which seem to indicate that the action was brought in connection with the maritime lien. (*Id.* at 3) Furthermore, the pleading provides that the lawsuit is based on Clause 10.00 of the agreement between Praxis and Greatwin, a clause which is entitled "Maritime Lien." (Singh Aff. Ex. 3) However, the cover page and conclusion of the pleading provides that Praxis is requesting a writ of preliminary attachment. (D.I. 39-2 at 3, 18) Praxis admits that "the Brazil Court recognized initially that Praxis was asserting claims *quasi in rem* against Sithonia (attaching its property, the Vessel), ***but only then held*** (for reasons that Praxis continues to appeal) ***that Praxis had no* quasi in rem *claim under Brazil law*.**" (D.I. 43 at 13) (emphasis added) Based on this concession, the Court understands that the Brazil Court ultimately concluded that the Brazilian Action was one *in rem* rather than *quasi in rem*. Since "[a] maritime lien and a proceeding *in rem* are correlative; where one exists, the other can be taken, and not otherwise," *Petroleos Mexicanos Refinacion*, 554 F.3d at 102-03, it must be true that the Brazilian Action was converted into an action *in rem* against the Vessel. The Court concludes that Praxis' maritime lien is tied up in the security held by the Brazil Court and, therefore, Praxis did not have a valid

14

maritime lien to cause the Vessel to be arrested in Delaware. Accordingly, the Clerk of Court will be directed to return Sithonia's security to Sithonia, Praxis' motion for summary judgment will be denied, Sithonia's motion for summary judgment will be granted, and Praxis' claims will be dismissed.

### 3. Presumption of Charterer's Authority to Bind Vessel

Having concluded that the Brazilian Action precluded Praxis from enforcing its maritime lien in Delaware, it is unnecessary to address whether Sithonia adequately rebutted the statutory presumption that Greatwin had authority to bind the Vessel. Nevertheless, the Court will briefly consider the arguments.

"Although a charterer is presumed to have authority to bind the vessel, the lien does not vest absolutely as a matter of law." *Belcher Oil Co. v. M/V Gardenia*, 766 F.2d 1508, 1512 (11th Cir. 1985). "A maritime lien does not arise when necessaries are ordered by one without authority to bind the vessel where the vessel owner can show that the supplier of necessaries had actual knowledge of the existence of any lack of authority relied upon as a defense." *Bomin Greece S.A. v. M/V Genco Success*, 2017 WL 2345709, at *1 (N.D.N.Y. May 30, 2017) (internal quotation marks omitted). "In other words, the presumption that a charterer had authority to bind a vessel to a maritime lien is 'rebutted' or 'overcome' where a defendant has shown that a supplier of necessaries has actual knowledge of the charterer's lack of authority to bind a vessel." *Id.*

Here, it is undisputed that Greatwin did not have authority from Sithonia to bind the Vessel or Sithonia. (D.I. 37-4) The central dispute concerns whether Praxis had actual knowledge of this fact.

15

It is undisputed that Evalend emailed the barge Carnival informing them of Greatwin's limited authority with respect to maritime liens. What is disputed is whether the email and the form Skipper Letter attached to the email, acknowledging on behalf of Alliance-Bunker that Greatwin cannot incur a maritime lien, was ever received by Alliance-Bunker or Praxis. Also disputed is whether the Bunker Delivery Note was stamped with a "no lien" stamp before or after delivery of the bunkers. Praxis points to a letter dated May 12, 2017 from the owner of the barge Carnival, but failed to submit a formal declaration or affidavit. Sithonia contends that the May 2017 letter must not be considered as it is an unsworn statement that is not based on personal knowledge. (D.I. 39 at 14) (citing Fed. R. Civ. P. 56(c)(4))

Sithonia's arguments fail for two reasons. First, as Praxis argues, Sithonia's evidence, even if taken as true, does not rebut the strong statutory presumption that Greatwin had authority, because there is no evidence that *Praxis*, as opposed to the barge Carnival or Alliance-Bunker, ever received notice of Greatwin's limited authority to incur maritime liens.

Second, "the addition of a 'no-lien stamp' or 'disclaimer stamp' affixed to a bunker delivery note is insufficient to provide such notice." *Bomin*, 2017 WL 2345709, at *2; *see also O.W. Bunker Malta Ltd. v. MV Trogir*, 602 Fed. App'x 673, 676 (9th Cir. 2015) (finding "no lien" stamp on delivery receipts was insufficient to give supplier notice that charterer had limited authority to bind the vessel); *Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743, 750 (5th Cir. 1985) ("That Gulf supplied the bunkers in Ceuta after learning of the no-lien clause is likewise not the kind of concrete proof necessary to show a deliberate intent to forego a lien for the Houston delivery."); *O.W. Bunker Malta Ltd. v. M/V Trogir*, 2013 WL 326993, at *3 (C.D. Cal. Jan. 29, 2013) ("Anti-lien stamps and provisions in the charterer or ship owner's contract are

generally insufficient to show that a supplier had actual knowledge."). Rather, "an 'affirmative communication' to the supplier" is what "may provide such notice." *Bomin*, 2017 WL 2345709, at *2; *see also O.W. Bunker Malta*, 2013 WL 326993, at *3 (requiring "affirmative communication . . . to one of the supplier's employees who has the ability to effect the negotiations and the contract"). Thus, Sithonia has failed to meet its "heavy burden" to rebut the statutory presumption in favor of a lien. *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 473 (5th Cir. 2003).

Accordingly, the Court concludes that there is a genuine issue of material fact as to whether Praxis had actual knowledge of Greatwin's limited authority to bind the Vessel. Nevertheless, as discussed above, since Praxis was not entitled to enforce a maritime lien against the Vessel when it arrived in Delaware, this conclusion does not affect the outcome of the pending motions.

### B. Motion for Discovery

Having already determined that Praxis' summary judgment motion will be denied and that Sithonia's summary judgment motion will be granted, the Court further finds that Sithonia's motion for discovery is moot.

### IV. CONCLUSION

For the reasons stated, Praxis' Motion for Summary Judgment and for Fed. R. Civ. P. 54(b) Final Judgment Entry (D.I. 22) will be denied, Sithonia's Cross Motion for Summary Judgment (D.I. 39-4) will be granted, and Sithonia's Motion for Discovery Prior to Filing Opposition to Praxis' Motion for Summary Judgment (D.I. 37) will be denied as moot. An appropriate Order follows.

17